**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GPA MIDSTREAM ASSOCIATION and AMERICAN PETROLEUM INSTITUTE | ) ) ) ) | |
| Petitioners, | ) ) | Case No. <u>22-1037</u> |
| v. | ) ) | |
| U.S. DEPARTMENT OF TRANSPORTATION and | ) ) ) | |
| PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, | ) ) ) ) | |
| Respondents. | ) | |

## PETITION FOR REVIEW

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, Circuit Rule 15, the Pipeline Safety Laws, 49 U.S.C. § 60119, and the Administrative Procedure Act, 5 U.S.C. § 702, the GPA Midstream Association and American Petroleum Institute hereby respectfully petition this Court for review of the interim final rule that amended the definition of unusually sensitive areas in 49 C.F.R. § 195.6 to include certain coastal waters or a coastal beach, effective as of February 25, 2022. The U.S. Department of Transportation and Pipeline and Hazardous Materials Safety Administration issued the interim final rule on

1

December 16, 2021, in response to the requirements in Section 19 of the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016, § 19, Pub. L. 114-183, 130 Stat. 514, as amended by Section 120 of the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, § 120, Pub. L. 116-260, 134 Stat. 1181. The Office of the Federal Register published the interim final rule in the Federal Register on December 27, 2021. *Pipeline Safety: Unusually Sensitive Areas for the Great Lakes, Coastal Beaches, and Certain Coastal Waters*, 86 Fed. Reg. 73,173 (Dec. 27, 2021) (amending 49 C.F.R. § 195.6, effective as of February 25, 2022). For the convenience of the Court, a copy of the interim final rule is attached to this Petition as Exhibit 1.

*/s/ Keith J. Coyle*
Keith J. Coyle
D.C. Circuit Bar No. 61558
Christina M. McKinley
D.C. Circuit Bar No. 53419
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW
Suite 700
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com

*Counsel for GPA Midstream Association and American Petroleum Institute*

Dated March 1, 2022

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA**

GPA MIDSTREAM　　　　　　)
ASSOCIATION and AMERICAN　)
PETROLEUM INSTITUTE　　　)
　　　　　　　　　　　　　　)
　　　　　　Petitioners,　　　)　　　Case No. _____
　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　)
U.S. DEPARTMENT OF　　　　)
TRANSPORTATION and　　　　)
　　　　　　　　　　　　　　)
PIPELINE AND HAZARDOUS　　)
MATERIALS SAFETY　　　　　)
ADMINISTRATION,　　　　　　)
　　　　　　　　　　　　　　)
　　　　　　Respondents.　　　)

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C.

Circuit Rule 26.1, Petitioners GPA Midstream Association ("GPA Midstream")

and American Petroleum Institute ("API") submit the following Corporate

Disclosure Statement.

GPA Midstream has served the U.S. energy industry since 1921.  GPA

Midstream is composed of nearly 60 corporate members that are engaged in the

gathering and processing of natural gas into merchantable pipeline gas, commonly

referred to as "midstream activities."  Such processing includes the removal of

impurities from the raw gas stream produced at the wellhead as well as the extraction for sale of natural gas liquid products ("NGLs") such as ethane, propane, butane, and natural gasoline or in the manufacture, transportation, or further processing of liquid products from natural gas. GPA Midstream membership accounts for more than 90 percent of the NGLs produced in the United States from natural gas processing. GPA Midstream has no parent companies, and no publicly-held company has a 10 percent or greater ownership interest in GPA Midstream

API is a national trade association representing all aspects of America's oil and natural gas industry. API has more than 630 members, from the largest major oil company to the smallest independents, from all segments of the industry, including producers, refiners, suppliers, pipeline operators, and marine transporters, as well as service and supply companies that support all segments of the industry. API has no parent company, and no publicly-held company has a 10 percent or greater ownership in API.

/s/ Keith J. Coyle
Keith J. Coyle
D.C. Circuit Bar No. 61558
Christina M. McKinley
D.C. Circuit Bar No. 53419
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW
Suite 700

Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com

*Counsel for GPA Midstream Association
and American Petroleum Institute*

Dated March 1, 2022

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

GPA MIDSTREAM
ASSOCIATION and AMERICAN
PETROLEUM INSTITUTE

          Petitioners,

    v.

U.S. DEPARTMENT OF
TRANSPORTATION and

PIPELINE AND HAZARDOUS
MATERIALS SAFETY
ADMINISTRATION,

          Respondents.

Case No. _____

## CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25(d) of the Federal Rules of Appellate

Procedure, I hereby certify that I have this day caused the foregoing "Petition for

Review" and "Corporate Disclosure Statement" to be served upon the following

parties by Federal Express overnight:

| | |
|---|---|
| Pete Buttigieg, Secretary<br>United States Department of<br>Transportation<br>Office of the Secretary<br>1200 New Jersey Ave., SE<br>Washington, DC 20590 | Tristan Brown, Deputy Administrator<br>Pipeline and Hazardous Materials<br>Safety Administration<br>Office of the Administrator<br>1200 New Jersey Ave., SE<br>Washington, DC 20590 |

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Dated at Washington, DC this 1st day of March 2022.

_/s/ Keith J. Coyle_
Keith J. Coyle

# EXHIBIT 1

wakefulness of the watchmen required in paragraph (a) of this section. Vessels with a keel laid date after March 28, 2022, must include plans for the monitoring device(s) within the plan submissions required in 46 CFR 177.202. The Coast Guard will work with the vessel operators to determine a reasonable implementation schedule once the plans are accepted. The monitoring device(s) must:

(1) Ensure the wakefulness of the crew in the event that the watchman required in paragraph (a) of this section is unresponsive;

(2) Remain operable during the nighttime watch; and

(3) Be arranged to ensure proper coverage of the passenger accommodation spaces, common areas, and spaces with potential fire hazards.

■ 27. Amend § 185.420 as follows:
■ a. Redesignate paragraphs (b) and (c) as paragraphs (c) and (d);
■ b. Add new paragraph (b); and
■ c. In newly redesignated paragraph (c):
■ i. Add the text ", monthly," after the word "initial"; and
■ ii. Remove the text "paragraph (a)" and add, in its place, the text "paragraphs (a) and (b)".

The addition reads as follows:

§ 185.420 **Crew training.**

\* \* \* \* \*

(b) For a vessel described by 46 CFR 175.110(c), the training program in paragraph (a) of this section must address firefighting proficiency and must include, but need not be limited to—

(1) Training in the use and location of firefighting equipment and general firefighting knowledge, including:

(i) Location of firefighting appliances and emergency escape routes;

(ii) Types and sources of ignition;

(iii) Flammable materials, fire hazards and spread of fire;

(iv) The need for constant vigilance;

(v) Actions to be taken on board;

(vi) Fire and smoke detection and automatic systems on board; and

(vii) Classification of fire and applicable extinguishing agents.

(2) The drills required by § 185.524, including fire location and fire type; and

(3) Emergency egress training for each member of the crew, to occur for all members of the crew—

(i) At least monthly while such members are employed on board the vessels; and

(ii) Each time a crew member joins the crew of such vessel.

\* \* \* \* \*

■ 28. Add § 185.507 to read as follows:

§ 185.507 **Passenger egress drills.**

(a) The master of a vessel described by 46 CFR 175.110(d) must conduct passenger emergency egress drills from the passengers' assigned overnight accommodation spaces prior to beginning an excursion with new passengers.

(1) If the passengers are not assigned an overnight accommodation space, the master of a vessel described by 46 CFR 175.110(d) must conduct passenger emergency egress drills from an accommodation space prior to beginning an excursion with new passengers.

(2) For the purposes of this section, excursion includes anytime the vessel gets underway, or anytime passengers remain overnight on the vessel.

(b) [Reserved]

■ 29. Delayed indefinitely, amend § 185.507 by adding paragraph (b) to read as follows:

§ 185.507 **Passenger egress drills.**

\* \* \* \* \*

(b) Passenger egress drills must be logged or otherwise documented for review by the Coast Guard upon request. The drill entry must include the following information:

(1) Date and time of the drill; and

(2) Number of drill participants.

■ 30. Add § 185.515 to read as follows:

§ 185.515 **Passenger safety bill.**

(a) [Reserved]

(b) Each passenger safety bill required by this section must list:

(1) The embarkation station and the number and location of the survival craft to which each passenger is assigned, if applicable;

(2) The fire and emergency signal and the abandon ship signal;

(3) Essential action that must be taken in an emergency; and

(4) If immersion suits are provided for passengers, the location of the suits and illustrated instructions on the method of donning the suits.

■ 31. Delayed indefinitely, amend § 185.515 by adding paragraph (a) to read as follows:

§ 185.515 **Passenger safety bill.**

(a) On vessels described by 46 CFR 175.110(d), a passenger safety bill must be posted by the master in each cabin or stateroom, and in passenger accommodation spaces.

\* \* \* \* \*

Dated: December 15, 2021.

**J.W. Mauger,**
*Rear Admiral, U.S. Coast Guard, Assistant Commandant for Prevention Policy.*
[FR Doc. 2021–27549 Filed 12–23–21; 8:45 am]
**BILLING CODE 9110–04–P**

# DEPARTMENT OF TRANSPORTATION

**Pipeline and Hazardous Materials Safety Administration**

**49 CFR Part 195**

[Docket No. PHMSA–2017–0152; Amdt. No. 195–104]

**RIN 2137–AF31**

**Pipeline Safety: Unusually Sensitive Areas for the Great Lakes, Coastal Beaches, and Certain Coastal Waters**

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), DOT.

**ACTION:** Interim final rule.

**SUMMARY:** PHMSA is amending the pipeline safety regulations to explicitly state that certain coastal waters, the Great Lakes, and coastal beaches are classified as unusually sensitive areas for the purpose of compliance with the hazardous liquid integrity management regulations. This amendment implements mandates contained in the Protecting our Infrastructure of Pipelines and Enhancing Safety (PIPES) Act of 2016, as amended by the PIPES Act of 2020. A hazardous liquid pipeline that could affect these newly designated areas must be included in an operator's integrity management program.

**DATES:** The effective date of the interim final rule is February 25, 2022. Submit comments by February 25, 2022.

**ADDRESSES:** You may submit comments, identified by Docket No. PHMSA–2017–0152, by any of the following methods:

• *E-Gov Web: http:// www.regulations.gov.* This site allows the public to enter comments on any **Federal Register** notice issued by any agency. Follow the online instructions for submitting comments.

• *Mail:* Docket Management System: U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building Ground Floor, Room W12–140, Washington, DC 20590–0001.

• *Hand Delivery:* DOT Docket Management System: West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, between 9:00 a.m. and 5:00 p.m. ET, Monday through Friday, except Federal holidays.

- *Fax:* 202–493–2251.
- *Instructions:* Identify the Docket No. PHMSA–2017–0152, at the beginning of your comments. If you submit your comments by mail, submit two copies. If you wish to receive confirmation that PHMSA received your comments, include a self-addressed stamped postcard. Internet users may submit comments at *http://www.regulations.gov.*
- *Note:* All comments received are posted without edits to *http://www.regulations.gov,* including any personal information provided. Please see the Privacy Act heading below.
- *Privacy Act:* In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *www.dot.gov/privacy.*
- *Confidential Business Information:* Confidential Business Information (CBI) is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments in response to this notice contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to this notice, it is important that you clearly designate the submitted comments as CBI. Pursuant to 49 Code of Federal Regulations (CFR) 190.343, you may ask PHMSA to provide confidential treatment to information you give to the agency by taking the following steps: (1) Mark each page of the original document submission containing CBI as "Confidential;" (2) send PHMSA a copy of the original document with the CBI deleted along with the original, unaltered document; and (3) explain why the information you are submitting is CBI. Submissions containing CBI should be sent to Sayler Palabrica, 1200 New Jersey Avenue SE, DOT: PHMSA—PHP–30, Washington, DC 20590–0001. Any commentary PHMSA receives that is not specifically designated as CBI will be placed in the public docket.
- *Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.* Follow the online instructions for accessing the dockets. Alternatively, you may review the documents in person at the street address listed above.

**FOR FURTHER INFORMATION CONTACT:**
Sayler Palabrica by phone at 202–744–0825 or via email at *sayler.palabrica@dot.gov.*

**SUPPLEMENTARY INFORMATION:**

I. Introduction
II. Hazardous Liquid Integrity Management
III. National Pipeline Mapping System
IV. Consequences of Hazardous Liquid
 Pipeline Spills in Coastal Areas and the
 Great Lakes
V. Legislative and Administrative History
VI. Summary of Amendments
VII. Effective Date and Comments
VIII. Good Cause Exception
IX. Regulatory Analyses and Notices

## I. Introduction

PHMSA issues this interim final rule (IFR) to satisfy mandates within the PIPES Act of 2016 (Pub. L. 114–183) and the PIPES Act of 2020 (Pub. L. 116–260) to expand application of integrity management (IM) requirements to approximately 2,905 additional miles of hazardous liquid and carbon dioxide pipelines [1] located within or that could affect the Great Lakes, coastal beaches, or "certain coastal waters." The IFR will provide enhanced protection from hazardous liquid pipeline accidents similar to the 2010 Marshall, MI and the 2015 Refugio Beach, CA oil spills, and ensure that events like the anchor strike that damaged Enbridge's Line 5 in the Straits of Mackinac are promptly identified and remediated before they result in environmental damage.

Hazardous liquid pipelines that could affect a high consequence area (HCA) are subject to additional safety requirements. Specifically, such pipelines must be included in an IM program. An HCA is defined in 49 CFR 195.450 as *a commercially navigable waterway,* a *high population area,* an *other populated area,* or an *unusually sensitive area* (USA) as defined in § 195.6. Section 195.6 identifies two types of USAs, "USA drinking water resources" and "USA ecological resources." Every USA is, therefore, also an HCA. Under § 195.452, an operator of a hazardous liquid pipeline that is located in a USA, or in an area where a release could affect a USA, is required to comply with IM requirements. Section 19 of the PIPES Act of 2016 amended 49 U.S.C. 60109(b)(2) and directed PHMSA to revise the definition of a USA in § 195.6(b) to explicitly state that the Great Lakes, coastal beaches, and marine coastal waters are USA ecological resources. Congress further clarified this mandate in Section 120 of the PIPES Act of 2020 (division R of the Consolidated Appropriations Act of 2021, Pub. L. 116–260). With this clarification, the PIPES Act of 2020 introduced and defined the term "certain coastal waters" to replace the undefined term "marine coastal waters." Congress defined "certain coastal waters" as the "territorial sea of the United States; the Great Lakes and their connecting waters; and the marine and estuarine waters of the United States up to the head of tidal influence." Furthermore, Congress defined the term "coastal beach" as "any land between the high- and low-water marks of certain coastal waters." This IFR incorporates these terms and the statutory definitions into § 195.6, as directed by Congress.

PHMSA maintains a map of HCAs, excluding proprietary or security sensitive information, in the National Pipeline Mapping System (NPMS) pursuant to 49 U.S.C. 60132(d). PHMSA intends to map "certain coastal waters" and "coastal beaches" as a single data layer within the NPMS. PHMSA will generate this map based on a combination of geographic information system (GIS) data from the National Oceanic and Atmospheric Administration (NOAA) Clean Water Act [2] dataset, U.S. Environmental Protection Agency (EPA) Estuary Data Mapper,[3] and the NOAA Sea Level Rise Viewer.[4] Each of these datasets are generated by expert scientific agencies of the Federal government and are available on the internet for public viewing. These datasets are further described in section VI of this IFR. PHMSA seeks comments on the use of these datasets to represent the location of the statutory definitions of "certain coastal waters" and "coastal beaches" in the NPMS.

While the primary effect of the IFR is expanding the hazardous liquid pipeline mileage subject to IM program requirements, defining new USAs also affects the requirements for certain pipelines in rural areas. Proximity to a USA also determines if an onshore rural gathering line is a regulated rural gathering line subject to safety requirements described in § 195.11(b). Additionally, a pipeline categorized as a

---

[1] Hereinafter, references to "hazardous liquid" pipelines will refer to both hazardous liquid and carbon dioxide pipelines for simplicity, as they are both governed by 49 CFR part 195.

[2] NOAA Office for Coastal Management, "Clean Water Act Dataset" (Nov. 9, 2016), *https://catalog.data.gov/dataset/clean-water-act (last accessed October 13, 2021).*

[3] EPA, "High End Scientific Computing—Estuary Data Mapper Dataset" (Dec. 7, 2020), *https://www.epa.gov/hesc/estuary-data-mapper-edm (last accessed June 21, 2021).*

[4] NOAA Office for Coastal Management, "Sea Level Rise Viewer Dataset" (July 2020), *https://catalog.data.gov/dataset/noaa-digital-coast-sea-level-rise-and-coastal-flooding-impacts-viewer (last accessed October 13, 2021).*

Category 3 rural low-stress pipeline could become a Category 1 or Category 2 pipeline if it is located within ½ mile of a USA.

PHMSA is not changing the definition of "offshore" in §§ 192.3 or 195.2 as a part of this IFR. Those sections define "offshore" to mean beyond the line of ordinary low water along that portion of the coast of the United States that is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters. The new USAs defined in § 195.6 do not affect the definition of "offshore" in §§ 192.3 or 195.2. Even if data used to map the new USAs refer to "offshore" areas as defined or designated by a separate statute, such as the Submerged Lands Act (43 U.S.C. 1301 *et seq.*), the regulatory definition of "offshore" in §§ 192.3 and 195.2 is distinct from these other statutes and will remain unchanged. In other words, the definitions of "coastal beach" and "certain coastal waters" exist independently of the definition of "offshore" in §§ 192.3 or 195.2. A pipeline could be located within certain coastal waters and be either "onshore" or "offshore" under §§ 192.3 and 195.2. Accordingly, altering the definition of "offshore" is beyond the scope of this IFR.

## II. Hazardous Liquid Integrity Management

The objective of the hazardous liquid IM requirements at § 195.452 is to reduce the risks of pipeline spills in areas where a release could have significant consequences. In a series of final rules published between 2000 and 2002, PHMSA's predecessor agency, the Research and Special Programs Administration, promulgated regulations that defined HCAs and required operators to develop and implement IM programs for each hazardous liquid pipeline that could affect an HCA in the event of a release. HCAs are defined in § 195.450 and represent areas where a release could have significant adverse consequences to human health and safety, the environment, and commercial navigation. The IM requirements that operators must implement to protect HCAs are specified in § 195.452.

IM requirements for hazardous liquid pipelines were implemented in four final rules. The first final rule was "Pipeline Integrity Management in High Consequence Areas (Hazardous Liquid Operators with 500 or More Miles of Pipeline)," [5] followed by "Areas Unusually Sensitive to Environmental

Damage," [6] and "Pipeline Integrity Management in High Consequence Areas (Hazardous Liquid Operators with Less Than 500 Miles of Pipelines)." [7] PHMSA made updates to these requirements in a 2019 final rule titled "Safety of Hazardous Liquid Pipelines." [8] These rules established a regulatory framework focused on risk identification, assessment, and mitigation. PHMSA's IM regulations require operators of pipelines located in areas where a release could affect an HCA to take additional steps to address threats to the integrity of those pipelines by operating and maintaining those pipelines in accordance with an effective IM program. These measures require operators to devote additional analysis, assessment, and remediation resources to protect HCAs from pipeline releases that could adversely affect human health and safety, cause environmental damage, and disrupt commercial navigation.

### A. High Consequence Areas

Section 195.450 of the existing hazardous liquid pipeline safety regulations defines an HCA as: (1) A *commercially navigable waterway,* which means a waterway where a substantial likelihood of commercial navigation exists; (2) a *high population area,* which means an urbanized area, as defined and delineated by the U.S. Census Bureau, that contains 50,000 or more people and has a population density of at least 1,000 people per square mile; (3) an *other populated area,* which means a place, as defined and delineated by the U.S. Census Bureau, that contains a concentrated population, such as an incorporated or unincorporated city, town, village, or other designated residential or commercial area; or (4) an *unusually sensitive area,* which is defined in § 195.6 to be a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release. Section 195.452(d)(2) requires operators to incorporate newly identified HCAs into their baseline assessment plans within one year from the date the area is identified, and complete a baseline assessment of any pipeline that could affect the newly identified HCA within 5 years from the date the area is so designated.

### B. Unusually Sensitive Areas

Section 195.6 defines a USA as a drinking water or ecological resource

area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release. The regulatory definition of USA elaborates that a drinking water resource generally refers to a source of drinking water (*e.g.,* a surface water intake, a source water protection area for wells, or a recharge area for a karst aquifer) for a community water system, or a non-transient, non-community water system (*e.g.,* a school or factory) with no adequate alternative supply of drinking water. The definition of a USA ecological resource includes areas containing one or more critically imperiled species or ecological communities; a multi-species assemblage area; a migratory waterbird concentration area; and an area containing an imperiled, threatened, endangered species, depleted marine mammal species, or an imperiled ecological community containing species with a limited range.

### C. Integrity Management Requirements

As described above, every USA is an HCA, and a hazardous liquid pipeline that could affect an HCA must be included in an operator's hazardous liquid IM program. Section 195.452(b) requires an operator to develop and follow a written IM program. Section 195.452(f) requires that a hazardous liquid pipeline IM program include each of the following elements:

• A process for identifying pipelines that could affect an HCA, including USAs (see §§ 195.6, 195.450, Appendix C to part 195, "Guidance for Implementation of an Integrity Management Program");

• A plan for scheduling and performing baseline assessments (§ 195.452(c));

• An analysis of pipeline safety risks that integrates all available information about pipeline integrity and potential consequences (§ 195.452(g));

• Criteria for performing remedial action in response to pipeline integrity issues identified during assessments or other analysis (§ 195.452(h));

• A continuous process for scheduling, performing, and interpreting integrity assessments and evaluations (§ 195.452(j));

• Identification of "preventative and mitigative measures" to protect the pipeline from identified integrity threats (§ 195.452(i));

• Procedures for evaluating the effectiveness of the IM program (§ 195.452(k)); and

• A process to ensure integrity assessment results and information analysis is performed by qualified personnel (§ 195.452(f)(8)).

---

[5] 65 FR 75377 (Dec. 1, 2000).

[6] 64 FR 9532 (Feb. 8, 2001).
[7] 67 FR 2136 (Jan. 16, 2002).
[8] 84 FR 52260 (Oct. 1, 2019).

When an operator determines that a pipeline segment could affect an HCA, it must integrate information about that segment, including information about potential consequences, into its risk analysis and add the segment to the baseline assessment plan. The minimum data attributes operators are required to consider are listed in § 195.452(g)(1). This includes information about the pipeline itself; excavation damage threats; information about the potential impacts of a release on an HCA; and data from integrity assessments, cathodic protection surveys, patrols, and other maintenance and surveillance tasks. This analysis is used to prioritize and schedule integrity assessments and identify preventative and mitigative measures.

If a pipeline segment could affect a newly identified USA as a result of this IFR, the operator must include that segment in their IM program and periodically assess the integrity of that segment. Section 195.452(d)(2) requires an operator to add pipelines that cross or could affect new HCAs into their baseline assessment plan within 1 year of obtaining that new HCA information and complete the baseline assessment within 5 years of that date. Section 195.452(c)(1)(i) requires that the baseline assessment be done with an in-line inspection tool unless construction or operational factors make an in-line inspection impracticable. The operator must select an in-line inspection tool, or combination of tools, capable of detecting, at a minimum, corrosion and dents. If cracking is identified as a probable integrity threat, then the operator must select a tool or combination of tools capable of detecting cracks. If an in-line inspection is impracticable, an operator may perform a baseline assessment using a pressure test, external corrosion direct assessment, or other technology with advance notification to PHMSA.

After the baseline assessment, a segment that could affect an HCA must be reassessed regularly. The assessment schedule for both the baseline assessment and reassessments must be established by considering all risk factors, including, at a minimum, each of the factors listed in § 195.452(e). Section 195.452(j)(3) requires operators to continually assess the pipeline's integrity at no greater than 5-year intervals, not to exceed 68 months, except as provided in § 195.452(j)(4). If the operator detects a defect during an assessment, the operator must remediate it pursuant to the requirements in § 195.452(h) and the operator's procedure. That paragraph requires an operator to establish repair criteria that

meet minimum standards for remediation methods and repair of various repair conditions.

In addition to assessment and repair requirements, operators must use a risk analysis to identify preventative and mitigative measures necessary to avert negative impacts in HCAs. Examples of preventative and mitigative measures identified in § 195.452(i) include adopting damage prevention best practices, improving cathodic protection monitoring, shortening inspection intervals, installing emergency flow restricting devices,[9] installing leak detection equipment, or providing enhanced response training to operator personnel and emergency responders. Operators must implement preventative and mitigative measures based on an analysis of the likelihood of a pipeline release and the potential consequences of the release. The minimum elements of this risk analysis are described in § 195.452(i)(2). Pipelines that could affect an HCA must have a means to detect leaks on the pipeline system(s) pursuant to § 195.452(i)(3), though §§ 195.134 and 195.444 require leak detection systems on hazardous liquid pipeline systems outside of HCAs as well.

## III. National Pipeline Mapping System

### A. NPMS Introduction

PHMSA maintains a map of HCAs in the NPMS pursuant to 49 U.S.C. 60132(d). The NPMS includes GIS resources that allow users to view pipeline maps and pipeline operations information, depending on the profile of the user. The NPMS contains locations and information about gas transmission and hazardous liquid pipelines and liquefied natural gas (LNG) plants under PHMSA jurisdiction. The NPMS also contains hazardous liquid pipeline HCA data [10] and voluntarily submitted breakout tank [11] data. NPMS data for hazardous liquid pipeline facilities include geospatial data, attribute data for pipeline segments, metadata, and operator contact information. Operators are required to submit NPMS data annually or review their current data in the NPMS to confirm it is still accurate pursuant to § 195.61. PHMSA processes

operator data submissions year-round and the online mapping applications and resources are updated approximately every other month. These data and submission requirements are described in further detail in § 195.61 and the Operator Standards Manual, available on the NPMS web page.[12]

The NPMS contains information from over 1,500 operators totaling over 225,000 miles of hazardous liquid pipelines and over 310,000 miles of gas transmission pipelines. Operators also voluntarily provided information on the location of 3,476 breakout tanks out of 8,412 reported in annual reports for the 2019 reporting year. PHMSA and others use NPMS data for a wide variety of purposes, including emergency response, inspection planning, risk assessment, regulatory support, spatial analysis, map production, public awareness, and education.

### B. NPMS Access to Geospatial Data

The NPMS website is structured into three pages by user-type to facilitate access to available information and resources. The pages include: (1) The Government Official Portal, intended for government officials at the local, State, or Federal level, including emergency responders and tribal governments; (2) the Operator Portal, intended for employees of pipeline operators who contribute data to the NPMS, including operators of gas transmission or hazardous liquid pipelines, breakout tanks, and LNG plants under PHMSA jurisdiction; [13] and (3) the General Public Portal, available for members of the public. The General Public Portal includes information about gas transmission and hazardous liquid pipelines, an operator directory, and the NPMS Public Map Viewer for exploring or printing NPMS maps on a per-county basis. The General Public Portal also has maps of HCAs. This includes the location of high-population areas derived from U.S. Census Bureau data and commercially navigable waterways from the U.S. Army Corps of Engineers' National Waterway Network. As an initial step to implement Section 19 of the PIPES Act of 2016, PHMSA, in 2019, incorporated GIS data for the Great Lakes USA ecological resource to the NPMS based on the definition of the Great Lakes from 33 U.S.C. 1268 and

---

[9] A check valve or a remote control valve as defined in § 195.450.

[10] While HCAs for hazardous liquid pipelines are defined areas under § 195.450, HCAs for gas pipelines are identified under § 192.903 based on the location, diameter, and maximum allowable operating pressure of the pipeline and the pipeline's proximity to nearby structures. *See also* 49 U.S.C. 60109(b).

[11] A breakout tank is a storage tank in a hazardous liquid pipeline system used as part of the transportation of hazardous liquids by pipeline. *See* § 195.2.

[12] PHMSA, "National Pipeline Mapping System Standards for Pipeline, Liquefied Natural Gas and Breakout Tank Farm Operator Submissions" (Oct. 2017). *https://www.npms.phmsa.dot.gov/ Documents/Operator_Standards.pdf.* (last accessed June 21, 2021).

[13] Operators can also use the Operator Portal to access information regarding NPMS data submission requirements, procedures, and HCA GIS data layers to support IM program planning.

geospatial information from NOAA's U.S. State Submerged Lands dataset.[14] NOAA updates this dataset as needed to ensure accuracy in depicting Great Lakes shorelines and last updated the dataset in 2016.

In addition to the three user-type pages discussed above, PHMSA has also developed the Pipeline Information Management Mapping Application (PIMMA). PIMMA is a password-protected, web-based mapping application limited to government officials and pipeline operators. Each government user only has access to the maps of pipelines in their area of jurisdiction, and each operator user only has access to maps of the pipelines they operate. Government officials or operators can apply for PIMMA access or log in to PIMMA from the NPMS homepage. Information on how to use and access PIMMA is available within the Government Official and Operator Portals.

Government officials and operators can request access to pipeline facility GIS data from the NPMS for use in their own GIS. This option allows government officials and operators to produce maps and conduct analyses. Government officials and operators may also apply for access to the NPMS pipeline facility GIS data in their area of jurisdiction or for the pipeline facilities they operate. Hazardous liquid operators may only access USA GIS data for the States in which they operate or are constructing hazardous liquid pipelines. Except for HCA and USA GIS data available on the General Public Portal (i.e., populated areas, commercially navigable waterways, and the Great Lakes), all GIS data from the NPMS is considered for official use only and requires an application process that can include an official request letter from a pipeline company manager. Detailed instructions for access to GIS data from the NPMS are available on the NPMS website at *https://www.npms.phmsa.dot.gov/.* PHMSA conducts reviews of publicly available dataset updates every two years to maintain HCA data accuracy. PHMSA announces updates via emails to pipeline operators and on the NPMS website.

## IV. Consequences of Hazardous Liquid Pipeline Spills in Coastal Areas and the Great Lakes

Any release of petroleum, petroleum products, or other hazardous liquids can adversely affect human health and safety, threaten wildlife and habitats, impede commercial navigation, or damage personal or commercial property. Spills into bodies of water present increased risk because the water and water currents act as conveyances to increase the spread of the spill. These factors greatly complicate response, recovery, and remediation efforts for spills affecting bodies of water and intertidal land along the shoreline. Major oil spills within the Great Lakes, shorelines, or coastal waters would have extreme, negative, and persistent impacts on shoreline ecology, benthic communities at the base of the ecosystem, fisheries, human health, and the economy of coastal communities. This IFR takes immediate action necessary to ensure that operators take appropriate steps to protect the Great Lakes, coastal communities, and marine waters from the impacts of hazardous liquid spills into these fragile environments. Although prediction of the precise number of avoided accidents realized by this rulemaking's extension of IM requirements to currently unregulated pipelines is challenging, the historical examples below underscore the magnitude of adverse environmental consequences for coastal beaches and coastal waters in the event of a significant pipeline accident.

The most recent significant pipeline accident that affected coastal beaches and coastal waters was a 2015 oil spill where a pipeline operated by Plains Pipeline, LP (Plains) failed due to external corrosion.[15] While this rupture occurred in an HCA and therefore was subject to PHMSA's IM requirements,[16] it highlights many of the probable impacts of oil pipeline spills into coastal areas. The rupture released 2,934 barrels (approximately 123,000 gallons) of heavy crude oil near Santa Barbara, California. Approximately 500 barrels (21,000 gallons) of crude oil reached the Pacific Ocean near Refugio State Beach. On March 13, 2020, the U.S. Department of Justice (DOJ) announced a settlement that required Plains pay over $60 million in penalties, clean-up costs, and natural resources assessment costs and damages.[17] This spill is estimated to have contaminated over 3,000 acres of shoreline, subtidal, and benthic habitats, and resulted in the injury or death to hundreds of birds and marine mammals.[18] In addition to the severe ecological impacts, the spill itself and cleanup activities significantly limited recreational and commercial use of the oil contaminated coastal beaches and surrounding areas.

Another accident demonstrating the significant adverse environmental consequences of pipeline spills into bodies of water was the rupture of Enbridge Line 6B, which occurred on July 26, 2010, near the town of Marshall, Michigan. While this spill occurred on a segment of pipe within an HCA [19] and along an inland, freshwater river, rather than along the coast, the adverse impacts resulting from this spill are similar to what could occur if a spill occurred in connecting waters of the Great Lakes estuaries, and other marine waters up to the head of tidal influence, which are specifically addressed in this rule. This accident occurred when a 30-inch pipeline ruptured, spilling approximately 20,000 barrels of diluted bitumen into the Kalamazoo River and surrounding wetlands. The release contaminated 40 miles of the Kalamazoo River, and cleanup efforts were complicated by the propensity for diluted bitumen and other heavy crude oils to sink. As a result of the spill, the impacted segment of the river remained closed for public, recreational use for nearly two years.[20] Environmental impacts continued in the years

---

[14] PHMSA, Press Release, "PHMSA ID's Great Lakes as an Ecological Resource in NPMS" (Oct. 21, 2019), *https://www.phmsa.dot.gov/news/phmsa-ids-great-lakes-ecological-resource-npms.*

[15] PHMSA, "Failure Investigation Report: Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015—Santa Barbara County, California" (May 2016), *https://www.phmsa.dot.gov/foia/plains-pipeline-lp-line-901-failure-investigation-report* (last accessed June 21, 2021).

[16] PHMSA and others brought a civil suit against Plains alleging, *inter alia,* that numerous violations of PHMSA's IM requirements contributed to the accident. *See United States of America, et al.* v. *Plains All America Pipeline,* L.P., Docket No. 2:20–cv–02415, Complaint at ¶¶ 130–158 (C.D. Cal. Mar. 13, 2020). Plains acceded to a consent decree resolving those violations. See *United States of America, et al.* v. *Plains All America Pipeline,* L.P., Docket No. 2:20–cv–02415, Consent Decree at ¶ 70 (C.D. Cal. Mar. 13, 2020).

[17] DOJ, "U.S. Pipeline Company to Modify its National Operations to Implement Safeguards Resulting from Oil Spill" (Mar. 13, 2020), *https://www.justice.gov/opa/pr/us-pipeline-company-modify-its-national-operations-implement-safeguards-resulting-oil-spill* (last accessed April 2, 2021).

[18] California Department of Fish and Wildlife et. al., "Refugio Beach Oil Spill: Draft Damage Assessment and Restoration Plan/Environmental Assessment" (April 22, 2020), *https://wildlife.ca.gov/OSPR/NRDA/Refugio* (last accessed June 21, 2021).

[19] Although this pipeline was subject to PHMSA's IM requirements, the operator's non-compliance with those requirements was a cause of the accident. While operator error is always possible, PHMSA believes that the inclusion of these requirements in this rulemaking will reduce the risk of future accidents. *See* PHMSA, CPF No. 3–2012–5013, In the Matter of Enbridge Energy Limited Partnership (Sept. 7, 2012), *https://primis.phmsa.dot.gov/comm/reports/enforce/documents/320125013/320125013_Final%20Order_09072012.pdf.*

[20] Klug, Fritz, "Kalamazoo River reopens to the public, 2 years after Enbridge oil spill in Michigan," *Michigan Live* (Jan. 20, 2019), *https://www.mlive.com/news/kalamazoo/2012/06/see_what_sections_of_the_kalam.html.*

following the spill, including decreases in fish abundance and variety in downstream areas until at least 2013.[21] Enbridge agreed to pay over $1 billion in cleanup costs and $177 million in a settlement with DOJ, including $61 million in penalties.[22] Other events occurring on pipelines in or that could affect HCAs, such as a 2018 anchor strike that dented the submerged Enbridge Line 5 in the Straits of Mackinac,[23] and the October 2021 discovery of a large crude oil release from a pipeline near Huntington Beach, CA,[24] further highlight the damage that can be done by a pipeline spill into the Great Lakes or other coastal waters.

Non-pipeline spills in coastal areas have also resulted in widespread environmental damage and economic impacts. In 1969, an offshore oil production platform experienced a blowout off the coast of Santa Barbara, California. That accident contaminated 35 miles of California shoreline.[25] That event was the largest marine oil spill in U.S. history until the grounding of the crude oil tanker, Exxon Valdez, in Prince William Sound, Alaska in 1989,[26] and later the blowout of the Deepwater Horizon drilling rig in the Gulf of Mexico in 2010.[27] Each of these events led to widespread harm to marine and coastal ecosystems, and economic harm to coastal resources such as fisheries and recreational areas.

[21] U.S. Fish and Wildlife Service et al., "Final Damage Assessment and Restoration Plan/ Environmental Assessment for the July 25–26, 2010 Enbridge Line 6B Oil Discharges near Marshall, MI" (Oct. 2015), *https://www.fws.gov/midwest/es/ec/ nrda/MichiganEnbridge/#.nrdar*.

[22] DOJ, "United States, Enbridge Reach $177 Million Settlement After 2010 Oil Spills in Michigan and Illinois" (July 20, 2016), *https:// www.justice.gov/opa/pr/united-states-enbridge- reach-177-million-settlement-after-2010-oil-spills- michigan-and* (last accessed July 26, 2021).

[23] National Transportation Safety Board, MAB– 19/12, "Marine Accident Brief, Anchor Contact of Articulated Tug and Barge Clyde S VanEnkevort/ Erie Trader with Underwater Cables and Pipelines" (May 21, 2018), *https://www.ntsb.gov/ investigations/AccidentReports/Pages/ MAB1912.aspx*.

[24] PHMSA, CPF No. 5–2021–054–CAO, Corrective Action Order issued to Amplify Energy Corp. (Oct. 4, 2021), *https://www.phmsa.dot.gov/news/phmsa- corrective-action-order-amplify-energy-corporation- beta-offshore*.

[25] Mai-Duc, Christine, "The 1969 Santa Barbara Oil Spill That Changed Oil and Gas Exploration Forever," *Los Angeles Times* (May 20, 2015), *https://www.latimes.com/local/lanow/la-me-ln- santa-barbara-oil-spill-1969-20150520- htmlstory.html*.

[26] EPA, "Exxon Valdez Spill Profile—U.S. EPA Emergency Response," *https://www.epa.gov/ emergency-response/exxon-valdez-spill-profile* (last accessed June 21, 2021).

[27] EPA, "Deepwater Horizon—BP Gulf of Mexico Oil Spill—U.S. EPA Enforcement," *https:// www.epa.gov/enforcement/deepwater-horizon-bp- gulf-mexico-oil-spill* (last accessed June 21, 2021).

## V. Legislative and Administrative History

### A. PIPES Act of 2016

With the passage of the PIPES Act of 2016, Congress amended 49 U.S.C. 60109(b) to add "locations . . . that have been identified as part of the Great Lakes or have been identified as coastal beaches, [or] marine coastal waters" to the list of "areas where a pipeline rupture would likely cause permanent or long-term environmental damage." Section 19 of the PIPES Act of 2016 ordered that PHMSA "revise section 195.6(b) of Title 49, Code of Federal Regulations, to explicitly state that the Great Lakes, coastal beaches, and marine coastal waters are USA ecological resources for purposes of determining whether a pipeline is located in a high consequence area." As described above, these areas will therefore be defined as HCAs, and operators of hazardous liquid pipelines that could affect such areas will be required to implement IM programs for those segments.

Based on the 2016 mandate, PHMSA searched for "locations that have been identified as part of the Great Lakes or have been identified as coastal beaches, [or] marine coastal waters." During this search, described in section VI.B, PHMSA used the definition of the Great Lakes from 33 U.S.C. 1268 and geospatial information from NOAA's U.S. State Submerged Lands dataset and added the Great Lakes to the NPMS. PHMSA was unable to locate any existing U.S. statutory or regulatory provision(s) providing similarly helpful definitions of "marine coastal waters" or "coastal beaches." Due to uncertainty regarding how to define "locations . . . that have been identified as a . . . coastal beaches [or] marine coastal waters" as described in the PIPES Act of 2016, PHMSA held two public meetings, discussed below, and began drafting an advance notice of proposed rulemaking to seek public input on how to best define those terms in part 195 and provide GIS data representing the location of those areas in the NPMS.

### B. Public Meetings

PHMSA held public meetings on November 17, 2017, and June 12, 2019, to discuss definitions for "coastal beaches," "marine coastal waters,"[28] and "the Great Lakes," and to identify GIS data sources to map such features in the NPMS. Both were in-person meetings in Washington, DC with

[28] As described in greater depth below, the PIPES Act of 2020 replaced the term "marine coastal waters" with "certain coastal waters."

options for remote participation. Materials presented during these meetings are available at the web page for each meeting.[29] The 2017 meeting included discussions on how PHMSA currently maps commercially navigable waterways in the Great Lakes. Representatives from PHMSA, NatureServe, NOAA, the Pipeline Safety Trust (PST), Phillips 66, Arcadis, and the Coastal and Marine Operators Pipeline Safety Industry Initiative (CAMO) gave presentations. The meeting included discussions of potential data sources for shoreline types, what should be classified as a "coastal beach," and where to define the landward and seaward extent of "marine coastal waters."

The 2019 meeting focused primarily on nine questions that PHMSA provided to attendees prior to the meeting, which included proposed definitions for "locations that have been identified as part of the Great Lakes, or have been identified as coastal beaches, [or] marine coastal waters." Also discussed was the creation of new USA ecological resource GIS data based on the proposed definitions. PHMSA developed the proposed definitions and other questions for the 2019 public meeting after reviewing comments from the 2017 public meeting, the data pilot project,[30] and PHMSA's internal research. Question 9A, presented to the public meeting participants, included a discussion on whether PHMSA should use the GIS data depicting the extent of the U.S. State Submerged Lands dataset to map the Great Lakes and Question 9B referenced the statutory definition of the Great Lakes found in 33 U.S.C. 1268. PHMSA ultimately determined that the U.S. State Submerged Lands GIS data was the best mapping source to match the existing Great Lakes definition and added these data to the NPMS. This change is described in section VI.B. PHMSA, American Petroleum Institute (including Plains All American Pipeline, L.P. and Freeman GIS, Inc.), PST, and the Louisiana Department of Natural Resources each gave presentations during the 2019 meeting.

[29] Materials from the November 2017 meeting can be found at *https://primis.phmsa.dot.gov/meetings/ MtgHome.mtg?mtg=129;* materials from the June 2019 Meeting can be found at *https:// primis.phmsa.dot.gov/meetings/ MtgHome.mtg?mtg=142.* Those meeting materials are also available in the docket for this rulemaking at *https://www.regulations.gov/docket?D=PHMSA- 2017-0094.*

[30] After the 2017 public meeting, PHMSA conducted a data pilot project to identify possible GIS data representing the definitions from the PIPES Act of 2016. The output of these data analyses are the suggested GIS data options and sample maps presented at the 2019 public meeting. These are available on the meeting page.

PHMSA requested that attendees post their questions and concerns to the docket for the meeting. Following the meeting, PHMSA worked to develop regulatory definitions and data sets addressing the challenges identified during the meeting and in public comments.

## C. PIPES Act of 2020

The PIPES Act of 2020 eliminated the uncertainty regarding the undefined terms "coastal beach" and "marine coastal waters," as they appeared in the PIPES Act of 2016. Section 120 of the PIPES Act of 2020 amended Section 19 of the PIPES Act of 2016. Congress eliminated the term "marine coastal waters" and replaced it with "certain coastal waters," which Congress defined as "the territorial sea of the United States; the Great Lakes and their connecting waters; and the marine and estuarine waters of the United States up to the head of tidal influence." Furthermore, Congress defined "coastal beach" as "any land between the high- and low-water marks of certain coastal waters." Congress directed PHMSA to incorporate those definitions within its regulations not later than 90 days after the enactment. This rule therefore incorporates the statutory definitions of "certain coastal waters" and "coastal beach" into § 195.6 verbatim. Nevertheless, PHMSA invites comments on its plan to implement this mandate in the NPMS, which is described in section VI.

## VI. Summary of Amendments

### A. Revisions to § 195.6

Pursuant to the plain language of Section 19 of the PIPES Act of the 2016, as amended by the PIPES Act of 2020, this IFR amends § 195.6 to explicitly state that the Great Lakes, coastal beaches, and certain coastal waters are USA ecological resources for the purposes of determining whether a pipeline is in an HCA, as defined in § 195.450. In the IFR, PHMSA has revised § 195.6(c) to include the terms "coastal beach" and "certain coastal waters," employing the statutorily mandated definitions in the PIPES Act of 2020. The implementation of these definitions in the NPMS is described in sections VI.B and VI.C below. This change also influences whether certain onshore rural gathering lines are regulated under § 195.11. The requirements for certain onshore rural gathering lines within ¼ mile of a USA are described in section VI.D below.

"Certain coastal waters" are defined in this rule as "the territorial sea of the United States; the Great Lakes and their

connecting waters; and the marine and estuarine waters of the United States up to the head of tidal influence." This language mirrors the definition provided in the PIPES Act of 2020. Pursuant to Presidential Proclamation 5928,[31] the territorial sea of the United States extends 12 nautical miles (approximately 13.8 miles) from the baseline of the United States.[32] Generally, the baseline is drawn at the line of Mean Lower Low Water, or the lowest of the two low tides per day averaged over an 18.6-year period, as determined by NOAA; however, a straight baseline is allowed in some circumstances.[33] In other words, the territorial sea portion of "certain coastal waters" extends from approximately the line of low tide to 12 nautical miles out to sea. The "marine and estuarine waters of the United States up to the head of tidal influence" refers to waters inland of the landward limit of the territorial sea up to the upstream limit of water affected by the tide.[34]

As discussed in section VI.B below, PHMSA was able to use the existing expert agency definition and data to identify the Great Lakes; PHMSA had already included the Great Lakes and connecting waters in the NPMS consistent with the existing statutory definition in 33 U.S.C. 1268. The Great Lakes and connecting waters include Lake Ontario, Lake Erie, Lake Huron (including Lake St. Clair), Lake Michigan, and Lake Superior, and the connecting channels (Saint Mary's River, Saint Clair River, Detroit River, Niagara River, and the Saint Lawrence River to the Canadian border). This GIS

---

[31] 54 FR 777 (Jan. 9, 1989).

[32] Although Presidential Proclamation 5928 contemplated that an earlier, 3 nautical mile boundary of the "territorial sea of the United States" would continue to apply in some regulatory regimes (e.g., in connection with the Clean Water Act (CWA, 33 U.S.C. 1251 et seq.)), PHMSA understands a 12 nautical mile boundary to be appropriate here. As noted elsewhere in this IFR, NOAA—in its literature and its GIS datasets—describes the "territorial sea" as being defined by a 12 nautical mile seaward boundary. Further, NPMS data yields that PHMSA's oversight of hazardous liquid pipelines under the pipeline safety regulations currently extends to a number of offshore pipelines located between the 3 nautical mile and the 12 nautical mile lines. Therefore, defining the seaward extent of the "territorial sea of the United States" by reference to a more limiting, 3 nautical mile boundary would not protect the environmental resources Congress sought to protect when incorporating that statutory language within the PIPES Act of 2020.

[33] Westington and Slagel, NOAA, "U.S. Maritime Zones and the Determination of the National Baseline" (2007), *https://www.gc.noaa.gov/pdfs/Westington_Slagel_2007.pdf*.

[34] NOAA, "Definition for 'Head of Tide'" in "NOAA Tides and Currents Glossary" *https://tidesandcurrents.noaa.gov/glossary.html (last accessed June 21, 2021).*

dataset similarly relies on NOAA shoreline data.

The term "coastal beach" is defined in the PIPES Act of 2020, and therefore, defined in this IFR as "any land between the high- and low-water marks of certain coastal waters." While earlier public meetings considered how the term "coastal beach" might apply to different shoreline types, the term "coastal beach" as defined the PIPES Act of 2020 directed that "coastal beach" covers "any land between the high- and low-water marks of certain coastal waters," meaning intertidal land adjoining coastal waters, regardless of geomorphologic characteristics. Further, the Great Lakes are considered non-tidal.[35]

### B. The Great Lakes in the NPMS

On October 21, 2019, PHMSA added the Great Lakes as a USA in the NPMS based on the mandate in Section 19 of the PIPES Act of 2016.[36] As described above, PHMSA defined the Great Lakes using an existing statutory definition at 33 U.S.C. 1268. PHMSA then selected corresponding geospatial information from the NOAA U.S. State Submerged Lands dataset to map the Great Lakes in the NPMS as a USA ecological resource based on that definition. PHMSA has not received any feedback on this approach and has determined that this information is consistent with the updated mandates in the PIPES Act of 2020, as it includes each of the Great Lakes and the connecting waters. Nevertheless, PHMSA seeks comments on the selection of this definition of the Great Lakes and the mapping data used to represent the location of the Great Lakes.

### C. Certain Coastal Waters and Coastal Beaches in the NPMS

As described above, PHMSA maintains GIS data of HCAs, including USAs, as part of the NPMS. PHMSA intends to map both "certain coastal waters" and "coastal beaches" as USAs in a single GIS dataset available from the NPMS using a composite of the data sets described in this section. The datasets prepared by the EPA and NOAA described here are developed through the collection of tidal and environmental data. These data, collected over years, establishes the location of "coastal beaches" and

---

[35] NOAA, "Do the Great Lakes Have Tides?" *https://oceanservice.noaa.gov/facts/gltides.html* (last accessed June 21, 2021).

[36] PHMSA, Press Release, "PHMSA ID's Great Lakes as an Ecological Resource in NPMS" (Oct. 21, 2019), *https://www.phmsa.dot.gov/news/phmsa-ids-great-lakes-ecological-resource-npms.*

''certain coastal waters'' as those terms were defined by Congress.

''Coastal beaches,'' as defined in the PIPES Act of 2020, extend from the high water mark to the low water mark, and the territorial sea portion of certain coastal waters extend from approximately the low water mars to the seaward extent of the U.S. territorial sea. Thus, the areas occupied by ''certain coastal waters'' and ''coastal beaches'' are contiguous and may overlap. This means that ''coastal beaches'' and the ''territorial sea of the United States'' GIS data to be mapped in the NPMS will cover all areas from near the line of high water to the seaward limit of the territorial sea of the United States. This entire area must now be considered as an ecological USA—and by extension, an HCA—for compliance with the IM requirements.

To provide GIS data representing the location of ''certain coastal waters'' and ''coastal beaches,'' PHMSA intends to create a single GIS dataset using a combination of data available from EPA and NOAA. Specifically, PHMSA intends to use the EPA Clean Water Act data prepared by NOAA, the EPA Estuary Data Mapper, and the NOAA Sea Level Rise Mean Higher High Water Data to create a single ''coastal beach'' and ''certain coastal waters'' USA dataset in the NPMS. PHMSA believes that aggregating these datasets from expert scientific Federal agencies represents the best-available national data on the location of ''certain coastal waters'' (the territorial sea of the United States, marine and estuarine waters of the United States up to the head of tide, and the Great Lakes), and ''coastal beaches'' (land between the high and low water marks). Each of these parent datasets are prepared and published by the expert agencies within the Federal government and are available to the public for download and review. The use of publicly available data addresses concerns about the availability of proprietary and security-sensitive information that were raised by the Pipeline Safety Trust and others during public meetings. PHMSA invites comments on the use of these datasets to satisfy the requirements of the PIPES Act of 2020.

PHMSA will use a portion of the GIS data NOAA compiled for EPA in compliance with the Clean Water Act (CWA) to represent the territorial sea portion of its new GIS dataset. Like the definition in the PIPES Act of 2020, the CWA refers to the territorial sea of the United States and the Great Lakes. The NOAA CWA dataset represents GIS data for the Great Lakes and connecting waters, as well as waters from the mean

high-water line to the 12 nautical mile line (*i.e.,* the seaward extent of the U.S. territorial sea per Presidential Proclamation No. 5928) and the 3 nautical mile line used for certain Federal laws existing on or before the issuance of Presidential Proclamation No. 5928, including the CWA. The landward boundary in the CWA dataset is defined by the NOAA Medium Resolution Shoreline Product [37] for the contiguous U.S., and other Federal data [38] for the shoreline in Alaska, Hawaii, and Puerto Rico. For the purposes of identifying the location of ''certain coastal waters,'' the seaward extent of the U.S. territorial sea is mapped at the 12 nautical mile line depicted in the NOAA CWA dataset in accordance with the meaning of that term in Presidential Proclamation No. 5928 and international law. The NOAA Medium Resolution Shoreline represents the line of mean high water.[39] These data are compiled from official NOAA nautical charts and represents the definitive map of U.S. maritime boundaries (such as the seaward extent of the U.S. territorial sea) under U.S. and international law.

While the U.S. territorial sea under Presidential Proclamation No. 5928, as mapped by NOAA, definitively represents the U.S. territorial sea and the Great Lakes, it does not identify the location of marine and estuarine waters of the United States up to the head of tidal influence. In order to accurately represent such waters, PHMSA intends to include data from the EPA Estuary Data Mapper in the NPMS map of certain coastal waters and coastal beaches. The Estuary Data Mapper includes GIS polygon data for approximately 2,000 named estuaries of the United States. For the purposes of this dataset, EPA defines an estuary as:

A partially enclosed body of water along the coast where freshwater from rivers and streams meet and mix with salt water from the ocean. Estuaries and the lands surrounding them are places of transition from land to sea, and although influenced by the tides, they are protected from the full force of ocean waves, winds, and storms by

such landforms as barrier islands or peninsulas.

This definition explicitly references tidal influences. PHMSA understands the Estuary Data Mapper data represents the most complete national inventory of estuarine waters. These data are designed to support environmental science and management efforts and the EPA National Estuary Program.[40] The Estuary Data Mapper is a relatively new GIS product tool, and it is not entirely complete in Alaska, Hawaii, and some areas of the Pacific Northwest. Nonetheless, during the course of the development of this document, EPA has reported ongoing progress in this area.

The term ''coastal beaches'' includes all land between the high and low-water marks. The Medium Resolution Shoreline used in the EPA map of the U.S. territorial sea represents a location between high and low-water marks. As stated earlier, the Medium Resolution Shoreline represents the mean high water of the shore. NOAA defines ''mean high water'' as ''the average of all high-water heights observed over the National Tidal Datum Epoch.'' [41] In contrast, NOAA defines the ''high-water mark'' as ''[a] line or mark left upon tide flats, beach, or along shore objects indicating the elevation of the intrusion of high water. The mark may be a line of oil or scum on along shore objects, or a more or less continuous deposit of fine shell or debris on the fore shore or berm.'' [42] Because this physical line changes with each tidal shift, NOAA measures and records the ''higher high water'' (HHW), which is the ''higher of the two high waters of a tidal day where the tide is semidiurnal (occurring twice daily).'' The average of the HHW values is the tidal datum (*i.e.,* a fixed starting point) known as the ''mean higher high water'' (MHHW).

As described above, the ''high-water mark'' changes daily because it is influenced by meteorological, climate, and surf conditions. PHMSA is not aware of any national data representative of the physical high-water mark, which is dynamic and changes day to day. In the absence of this information, PHMSA will use the MHHW GIS data product from NOAA's Sea Level Rise Viewer to approximate

---

[37] NOAA, ''NOAA Medium Resolution Shoreline'' (Apr. 7, 2000), *https://shoreline.noaa.gov/data/datasheets/medres.html#:~:text=Abstract%3A%20NOAA's%20medium%2Dresolution%20shoreline,set%20created%20for%20general%20use.&text=The%20data%20set%20was%20created,Ocean%20Resources%20Conservation%20and%20Assessment* (last accessed June 21, 2021).

[38] For more information on these datasets, see the ''Lineage'' section of the metadata for this dataset *https://www.fisheries.noaa.gov/inport/item/48856.*

[39] *See* NOAA, ''Definition of 'Mean High Water' in Tides and Currents Glossary'' *https://tidesandcurrents.noaa.gov/glossary.html* (last accessed June 21, 2021).

[40] EPA, ''Frequently Asked Questions about Estuary Data Mapper'' *https://www.epa.gov/hesc/frequent-questions-about-estuary-data-mapper-edm* (last accessed June 21, 2021).

[41] NOAA, ''Tidal Datums'' *https://tidesandcurrents.noaa.gov/datum_options.html* (last accessed June 21, 2021).

[42] NOAA, ''Definition of 'High Water Mark' in ''Glossary of the NOAA Shoreline website'' *https://shoreline.noaa.gov/glossary.html* (last accessed June 21, 2021).

the location of the dynamic high-water mark. The NOAA Sea Level Rise Viewer includes digital elevation models and the NOAA tidal datum of mean higher high water. In certain locations and in certain meteorological conditions, the MHHW could be lower than a high-water mark. Nonetheless, the MHHW is the most accurate dataset that PHMSA is aware of for identifying the high-water mark and marine and estuarine waters up to the head of tidal influence. PHMSA acknowledges that MHHW may not precisely align with the exact physical high-water mark (indicated by fine debris or scum line) at any given time. In any event, the IM requirements apply not only to segments of hazardous liquid pipelines that cross an HCA but also to any pipeline segments that "could affect" an HCA. In determining which segments "could affect" an area, operators need to consider the terrain around the pipeline and natural forces inherent in the area, including tidal forces, meteorological conditions, and flood zones, when determining which pipeline segments could affect an HCA (See section I.B. of appendix C to part 195).

## D. Requirements for Pipelines That Could Affect HCAs

As described in section II, changes to the definition of the term "USA" affect the hazardous liquid pipelines subject to IM requirements. Operators of hazardous liquid pipelines that could affect the Great Lakes, "certain coastal waters," and "coastal beaches" must include those segments in an IM program. Based on a geospatial analysis using data in the NPMS, PHMSA estimates that 2,905 additional miles of hazardous liquid pipelines, primarily in states adjoining the Gulf of Mexico, will be subject to liquid IM requirements due to this IFR. This estimate reflects segments located within ¼ mile of any of the newly defined USAs but are not located within ¼ mile of the location of existing HCAs described in existing §§ 195.6 and 195.450. Based on this analysis, PHMSA anticipates that most affected operators have an existing IM program and will be able to extend that plan to include the newly covered segments. This analysis is described in the RIA for this IFR.

In addition, operators of onshore hazardous liquid pipelines submerged more than 150 feet below the surface of water that could affect an HCA must comply with enhanced requirements for submerged pipelines in self-executing provisions described in § 120(d) of the PIPES Act of 2020, codified at 49 U.S.C. 60109(g). That section of the pipeline safety laws (49 U.S.C. 60101 *et seq.*)

requires that operators perform annual in-line inspections, annual route surveys, and have (and follow) procedures for assessing the potential impacts from third-party damage from vessels and maritime equipment, including anchors and anchor chains.

The presence of a USA also effects which onshore gathering lines are subject to part 195 safety requirements as regulated rural gathering lines. Section 195.2 defines a rural area as being outside the limits of any incorporated or unincorporated city, town, village, or any other designated residential or commercial area such as a subdivision, a business or shopping center, or community development. Currently, an onshore rural gathering line is subject to safety requirements in § 195.11 if the pipeline has a nominal diameter from 6⅝ inches to 8⅝ inches, has a stress level greater than 20 percent of the specified minimum yield strength (or a pressure of 125 pounds per square inch gauge (psig) for non-steel pipe or if the stress level is not known), and is located within ¼-mile of a USA. Defining new USAs may result in additional pipelines being classified as regulated rural gathering lines. However, PHMSA expects that the effect of the IFR on the mileage of onshore regulated rural gathering lines will be limited since rural gathering lines are not generally located along the coasts near most of the new USAs established by the IFR. Further, those rural gathering lines that are near the coasts may already be subject to part 195 requirements (pursuant to § 195.1) if they are either located in a non-rural area, cross commercially navigable waterways, or are located in the inlets of the Gulf of Mexico.[43] As discussed in the RIA, PHMSA estimates that 58.5 miles of currently unregulated rural gathering lines will become regulated, and that the resulting regulatory burden for those lines will be $63 thousand in the first year of analysis, and $15 thousand in years two through ten. PHMSA welcomes comment on its assumptions regarding the mileage and regulatory burden for currently unregulated gathering lines that become regulated as a result of the IFR, as well as corresponding safety benefits.

Rural gathering lines between 6⅝ inches and 8⅝ inches in diameter that become regulated rural gathering lines as a result of the IFR become subject to the requirements listed in § 195.11(b). An operator of a regulated rural gathering line must comply with

reporting requirements in subpart B of part 195; establish a maximum operating pressure of the pipeline in accordance with § 195.406; install and maintain line markers in accordance with § 195.410; establish and carry out a public education program in accordance with § 195.440; establish and carry out a damage prevention program in accordance with § 195.442; comply with corrosion control requirements in subpart H; establish and carry out a program to identify internal corrosion in accordance with § 195.11(b)(10); and comply with operator qualification program requirements in accordance with subpart G to part 195 and § 195.505. A new or replaced regulated rural gathering line must also comply with the initial design, installation, construction inspection, and testing requirements in part 195, unless that pipeline is being converted to service under § 195.5. Pursuant to § 195.11(c), an operator most comply with § 195.11(b)(2)–(11) within 6 months from the date that a new USA has been identified, except for the requirements for corrosion control, which are subject to the compliance timelines in part 195, subpart H.

Finally, the part 195 requirements applicable to low-stress pipelines located in rural areas depend on the pipeline's proximity to a USA. Section 195.12 defines a low-stress rural pipeline as a line located in a rural area and having a maximum operating pressure corresponding to a stress level of 20 percent or less of the specified minimum yield strength (or if the stress level is unknown, or for non-steel pipelines, a pressure less than or equal to 125 psig). A rural low-stress line that is located within ½ mile of a USA (or alternatively, that could affect an HCA as determined in § 195.452(a)) is a Category 1 or Category 2 rural low-stress line that must comply with all of the safety requirements in part 195. Other rural low-stress pipelines not within ½ mile of a USA are Category 3 lines that must comply with all the requirements of part 195 except the IM program requirements in § 195.452. Pursuant to § 195.12(e), a Category 3 rural low-stress line or any other pipeline that becomes a Category 1 or Category 2 rural low-stress line must comply with the IM program requirements within 12 months following the date the USA is identified (*i.e.*, the effective date of this IFR). IM program requirements are described in detail above.

Because the IFR expands the scope of USAs, some Category 3 rural low-stress lines may become Categories 1 or 2 rural low stress lines and, therefore, would be

---

[43] PHMSA also notes that gathering lines larger than 8⅝ inches are already subject to part 195 safety requirements.

subject to IM program requirements at § 195.452(a). However, similar to the discussion of onshore regulated rural gathering above and as explained in the RIA, PHMSA understands relatively few rural low-stress pipelines will be affected by the IFR. Newly impacted rural low-stress lines located within ¼-mile of the new USAs are included in the RIA mileage estimate. However, PHMSA did not perform a separate analysis of rural-low stress lines located between ¼ mile and ½ mile of a newly designated USA. PHMSA expects the (current) Category 3 pipeline mileage which could be so affected to be minimal given that much of the rural low-stress lines near a coast would cross navigable waters and therefore would already be subject to IM program requirements under § 195.1. However, in 2020, operators reported only 3,100 miles of rural low-stress hazardous liquid lines total across all reported categories. Similar to the discussion of regulated rural gathering lines, much of the pipeline mileage near the new USAs (which are mostly along the coasts) is already subject to IM program requirements pursuant to the general applicability of part 195 to pipelines crossing navigable waters or that are located in the inlets of the Gulf of Mexico in § 195.1(a). Further, operators of rural low-stress liquid lines have the option to perform an HCA could-affect analysis under § 195.452(a) rather than use the ½-mile criteria.

## VII. Effective Date and Comments

This IFR is effective without advance notice and public comment as the amendments to the CFR in the IFR are not subject to agency discretion. Section 19 of the PIPES Act of 2016, as amended by the PIPES Act of 2020 states that the Secretary "shall revise section 195.6 [. . .] to explicitly state that the Great Lakes, coastal beaches and certain coastal waters are USA ecological resources." The PIPES Act of 2020 further specifies statutory definitions for each of these terms. Pursuant to the plain language of the mandates from the PIPES Act of 2016 and the PIPES Act of 2020, the IFR adopts each of these statutory definitions into § 195.6 verbatim. While PHMSA has no discretion regarding the amendments to § 195.6 mandated by the Act, this IFR invites comments on the national and publicly available GIS datasets to represent these new Ecological USA definitions in the NPMS.

PHMSA will consider all relevant, substantive comments in this area. PHMSA encourages interested parties to submit comments that: (1) Identify the amendments being commented on and

the appropriate section numbers; (2) provide justification for their support or opposition to the amendments, especially data on safety risks and cost burdens; and (3) provide specific alternatives if appropriate.

## VIII. Good Cause Exception

The Administrative Procedure Act (APA, 5 U.S.C. 551 *et seq.*) permits an agency to issue a final rule without first publishing a proposed rule for public comment when it demonstrates "good cause" that notice and comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 552 (b)(3)(B). This exception is narrow, and PHMSA is proceeding with an IFR only in light of the specific instructions from Congress in the PIPES Act of 2020 that render comment both unnecessary and impracticable.

Prior notice and comment are unnecessary for this rulemaking because Congress, in the PIPES Act of 2020, provided clear, defined terms and required PHMSA to update its regulations to incorporate those terms. Specifically, Congress clarified that "certain coastal waters" means the territorial sea of the United States, the Great Lakes, and marine and estuarine waters up to the head of tidal influence. Congress also clarified which areas must be designated as a "coastal beach." These statutory definitions resolved uncertainties within language in the PIPES Act of 2016 to expand the hazardous liquid pipelines subject to IM requirements. Congress did not provide discretion for PHMSA to adopt the regulatory amendments in this IFR, requiring PHMSA to "revise § 195.6(b) to explicitly state that the Great Lakes, coastal beaches, and certain coastal waters are USA ecological resources for purposes of determining whether a pipeline is in a high consequence area."

Notice and comment are also unnecessary because the definitions of the terms that Congress required PHMSA to include in its regulations are also further specifically defined by other expert Federal agencies, as described in the paragraphs that follow.

"The territorial sea of the United States" has a long-established meaning based on Presidential Proclamation 5928, international law, and NOAA data sets. Each of these authorities define and designate the "territorial sea of the United States," as extending 12 nautical miles (approximately 13.8 miles) from the "baseline." NOAA is responsible for delineating the "baseline," based on its tidal datum Mean Lower Low Water, or the lowest of the two low tides per day averaged over an 18.6-year period.

Next, NOAA has defined the boundaries of "marine waters of the United States." While the term "marine waters" is not specifically defined in the U.S. Code, NOAA has defined "marine waters" as those waters subject to tidal influence. The seaward boundary of "marine waters" would be the extent of "the territorial seas of the United States," as described above. The landward boundary of the "marine waters" is designated by NOAA's polygon GIS data identifying the MHHW values. These values are the averages of daily HHW recordings from NOAA tide stations over a period of 18.6 years.

EPA defines the boundaries of "estuarine waters of the United States." The Clean Water Act authorizes EPA to define and map estuarine resources pursuant to the National Estuary Program provided for in the Clean Water Act (33 U.S.C. 1330). As described above, EPA similarly defines estuaries as subject to tidal influence. The EPA has also made estuary polygon data available in EPA's Estuary Data Mapper (EDM) that maps approximately 2,000 named estuaries identified using EPA's Environmental Monitoring and Assessment Program's National Coastal Condition Assessment.

NOAA has also defined the terms used in Congress' definition for "coastal beaches." The PIPES Act of 2020 defines the term "coastal beach" to mean any land between the high- and low-water marks of certain coastal waters. As discussed above, NOAA has defined and mapped the MHHW, which is an authoritative tidal datum for approximating a "high water mark." In contrast, the low water mark need not be defined for the purposes of the PIPES Act of 2020 because everything seaward of the high water mark is included in either the "territorial sea of the United States," or the "marine and estuarine waters of the United States up to the head of tidal influence"—terms which, as explained above, have been defined and mapped by NOAA and EPA.

Given the above, PHMSA has determined that it lacks discretion to alter or consider alteration of the long-standing definitions or practical understandings of "the territorial sea of the United States," "marine waters of the United States," "estuarine waters of the United States," and "coastal beaches." Similarly, PHMSA lacks discretion to alter or consider redesignation of the GIS polygons as depicted in NOAA's Clean Water Act data, the EPA EDM, and the NOAA Sea Level Rise MHHW Data. Changes to these definitions and designations would be inaccurate, would cause

confusion, and would be an unnecessary waste of government resources. Therefore, a traditional notice and comment rulemaking is unnecessary.

The Congressionally-specified regulatory language, along with an aggressive Congressional deadline, also render traditional notice and comment impracticable. In light of the earlier challenges PHMSA faced in defining and mapping the undefined terms "marine coastal waters" and "coastal beaches," Congress in the PIPES Act of 2020 intervened in a pending PHMSA rulemaking (under the same RIN as this rulemaking) to ensure PHMSA had the tools—clear, defined terms in place of the ambiguous language in the PIPES Act of 2016—to resolve the bases for PHMSA's protracted delay in responding to an earlier rulemaking mandate. Congress also demanded PHMSA "complete" those regulatory amendments within 90 days of enactment of the PIPES Act of 2020. Congress' expectations regarding the need for prompt PHMSA action to complete this rulemaking is understandable given the history of hazardous liquid pipeline accidents that have affected or threatened coastal waters and the Great Lakes and other sensitive ecosystems. The negative environmental and human health impacts of hazardous liquid releases such as the 2010 Marshall, MI and 2015 Plains accidents persist for years, even despite best clean-up efforts. The 2018 anchor strike on Enbridge Line 5 further underscored the urgency of updating PHMSA's regulatory framework to address those risks. More recently, members of Congress have also identified the October 2021 discovery of a large crude oil release from a pipeline near Huntington Beach, CA, as evidence of the need for prompt PHMSA action to complete this rulemaking.[44]

Further delay of this IFR's regulatory revisions to accommodate notice and comment procedures would, therefore, frustrate an aggressive Congressional timeline for prompt completion of the specific regulatory amendments that Congress understood as being necessary to align PHMSA's IM regulations with the grave public safety and environmental risks posed by hazardous liquid lines. For those reasons, traditional notice and comment procedures are impracticable.

## IX. Regulatory Analyses and Notices

### Legal Authority for This Rulemaking

This IFR is published under the authority of the Federal Pipeline Safety Laws. Section 60102 authorizes the Secretary of Transportation to issue regulations governing the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities. The Secretary has delegated this authority to the PHMSA Administrator under 49 CFR 1.97. Further, Section 19 of the PIPES Act of 2016, as amended by the PIPES Act of 2020, requires the Secretary of Transportation to revise § 195.6 to explicitly state in § 195.6 that the Great Lakes, certain coastal waters, and coastal beaches are USAs for the purpose of determining whether a hazardous liquid pipeline is in or could affect an HCA.

### Executive Order 12866 and DOT Policies and Procedures for Rulemaking

Executive Order 12866 ("Regulatory Planning and Review")[45] requires that agencies "should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." Agencies should consider quantifiable measures and qualitative measures of costs and benefits that are difficult to quantify. Further, Executive Order 12866 requires that "agencies should select those [regulatory] approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach." Similarly, DOT Order 2100.6A ("Rulemaking and Guidance Procedures") requires that regulations issued by PHMSA and other DOT Operating Administrations should consider an assessment of the potential benefits, costs, and other important impacts of the proposed action and should quantify (to the extent practicable) the benefits, costs, and any significant distributional impacts, including any environmental impacts. The Federal pipeline safety laws at 49 U.S.C. 60102(b)(5) further authorize only those safety requirements whose benefits (including safety and environmental benefits) have been determined to justify their costs.

Executive Order 12866 and DOT Order 2100.6A require that PHMSA submit "significant regulatory actions" to the Office of Management and Budget (OMB) for review. This IFR has been determined to be significant under section 3(f) of Executive Order 12866 and was reviewed by OMB. It is also considered significant under DOT Order 2100.6A. The Office of Information and Regulatory Affairs (OIRA) has not, however, designated this rule as a "major rule" as defined by the Congressional Review Act (5 U.S.C. 801 *et seq.*).

PHMSA estimates that the IFR will result in unquantified public safety and environmental benefits associated with preventing and mitigating hazardous liquid pipeline accidents within or that could affect coastal beaches, coastal waters, or the Great Lakes. PHMSA estimates annualized costs of between $3.91 million per year (using a 3 percent discount rate) and $3.98 million per year (using a 7 percent discount rate) due to costs associating with establishing or updating IM programs and performing integrity assessments. The costs and benefits of the IFR are described in further detail in the RIA, which is available in the docket.

### Executive Order 13132

PHMSA analyzed this IFR in accordance with Executive Order 13132 ("Federalism").[46] Executive Order 13132 requires agencies to assure meaningful and timely input by State and local officials in the development of regulatory policies that may have "substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government."

This IFR does not have a substantial direct effect on State and local governments, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government. This rulemaking action does not impose substantial direct compliance costs on State and local governments.

While the IFR may operate to preempt some State requirements, it does not impose any regulation that has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government. The pipeline safety laws, specifically 49 U.S.C. 60104(c), prohibit State safety regulation of interstate pipeline facilities. Although the pipeline safety laws allow States to augment pipeline safety requirements

---

[44] *See* Letter from Reps. Graves & Crawford to Acting PHMSA Administrator Brown (Oct. 14, 2021), *https://republicans-transportation. house.gov/news/ documentsingle.aspx?DocumentID=405635.*

[45] 58 FR 51735 (Oct. 4, 1993).

[46] 64 FR 43255 (Aug. 10, 1999).

for intrastate pipeline facilities, States may not issue safety requirements less stringent than those required by Federal law. A State may also regulate an intrastate pipeline facility PHMSA does not regulate.

In this instance, the preemptive effect of the IFR is limited to the minimum level necessary to achieve the objectives of the Federal pipeline safety law under which the IFR is promulgated. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

*Environmental Justice*

DOT Order 5610.2C and Executive Orders 12898 ("Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations"),[47] 13985 ("Advancing Racial Equity and Support for Underserved Communities Through the Federal Government"),[48] 13990 ("Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis"),[49] and 14008 ("Tackling the Climate Crisis at Home and Abroad")[50] require DOT Operating Administrations to achieve environmental justice as part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects, including interrelated social and economic effects, of their programs, policies, and activities on minority populations, low-income populations, and other disadvantaged communities.

PHMSA has evaluated this IFR under DOT Order 5610.2C and the Executive Orders listed above and has determined it will not cause disproportionately high nor adverse human health and environmental effects on minority populations, low-income populations, or other underserved and disadvantaged communities. The IFR is facially neutral and national in scope; it is neither directed toward a particular population, region, or community, nor is it expected to adversely impact any particular population, region, or community. Indeed, because PHMSA expects the rulemaking will reduce the safety and environmental risks associated with hazardous liquid pipelines generally, PHMSA understands the regulatory amendments introduced by this IFR will, in fact, reduce any disproportionate human health and environmental risks for minority populations, low-income populations,

or other underserved and other disadvantaged communities in the vicinity of pipelines within the scope of the IFR's amendments.

*Executive Order 13175*

PHMSA analyzed this IFR in accordance with the principles and criteria in Executive Order 13175 ("Consultation and Coordination with Indian Tribal Governments")[51] and DOT Order 5301.1 ("Department of Transportation Programs, Polices, and Procedures Affecting American Indians, Alaska Natives, and Tribes"). Executive Order 13175 requires agencies to assure meaningful and timely input from tribal government representatives in the development of rules that significantly or uniquely affect tribal communities by imposing "substantial direct compliance costs" or "substantial direct effects" on such communities or the relationship and distribution of power between the Federal government and tribes.

PHMSA assessed the impact of the IFR and determined that it will not significantly or uniquely affect tribal communities or Indian tribal governments. The rulemaking's regulatory amendments are facially neutral and will have broad, national scope; PHMSA, therefore, does not expect this rulemaking to significantly or uniquely affect tribal communities, much less impose substantial compliance costs on Native American Tribal governments or mandate Tribal action. And insofar as PHMSA expects the rulemaking will improve safety and reduce environmental risks associated with hazardous liquid pipelines, PHMSA has concluded it will not entail disproportionately high adverse risks for Tribal communities. The funding and consultation requirements of Executive Order 13175 do not apply.

*Regulatory Flexibility Act, Executive Order 13272*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires Federal agencies to conduct a Regulatory Flexibility Analysis (RFA) for any rule subject to notice-and-comment rulemaking under the APA unless the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. This final rule was developed in accordance with Executive Order 13272 ("Proper Consideration of Small Entities in Agency Rulemaking")[52] to promote compliance with the RFA and to ensure that the potential impacts of

the rulemaking on small entities has been properly considered.

As discussed above, PHMSA has determined that there is "good cause" to forego prior notice and comment and amend the pipeline safety regulations through this IFR. The Regulatory Flexibility Act, therefore, does not require PHMSA to conduct an RFA. Nonetheless, PHMSA conducted a screening analysis of the impact of the IFR on small entities, which is included in a final RFA within the rulemaking docket. As explained at greater length in that RFA, PHMSA has analyzed NPMS data and determined that only a small share of hazardous liquid pipeline mileage nationwide will be affected by the IFR—and the operators of most of that mileage either (1) already have IM programs, or (2) are not small entities. Further, the compliance costs incurred by even the handful of small entities that would be affected will not be "significant" under the Regulatory Flexibility Act. For these reasons, PHMSA certifies that the IFR will not have a significant economic impact on a substantial number of small entities.

*Paperwork Reduction Act*

The Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) establishes policies and procedures for controlling paperwork burdens imposed by Federal agencies on the public. Pursuant to 44 U.S.C. 3506(c)(2)(B) and 5 CFR 1320.8(d), PHMSA must provide interested members of the public and affected agencies with an opportunity to comment on information collection and recordkeeping requests. PHMSA expects this IFR to impact the information collections described below.

PHMSA will submit an information collection revision request to OMB for approval based on the requirements in this IFR. The following information is provided for each affected information collection: (1) Title of the information collection; (2) OMB control number; (3) current expiration date; (4) type of request; (5) abstract of the information collection activity; (6) description of affected public; (7) estimate of total annual reporting and recordkeeping burden; and (8) frequency of collection. The information collection burden for the following information collection is estimated to be revised as follows:

*1. Title:* Hazardous Liquid Pipeline Assessment Requirements.

*OMB Control Number:* 2137–0605.
*Current Expiration Date:* 4/30/23.
*Abstract:* This information collection covers documentation and notifications associated with hazardous liquid pipeline IM requirements. These requirements include documentation of

[47] 59 FR 7629 (Feb. 16, 1994).
[48] 86 FR 7009 (Jan. 20, 2021).
[49] 86 FR 7037 (Jan. 20, 2021).
[50] 86 FR 7619 (Feb. 1, 2021).
[51] 65 FR 67249 (Nov. 9, 2000).
[52] 67 FR 53461 (Aug. 16, 2002).

continual assessment and evaluation and preventative and mitigative measures. PHMSA estimates that the new USA definitions in the IFR will require 6 operators to create new IM programs, resulting in 46,640 hours of additional burden to prepare an IM program and integrate safety information in the first year and 1,860 hours of additional burden each subsequent year. This results in an average annual burden increase of 16,787 hours per year over 3 years. PHMSA estimates that the remaining 105 affected operators are already subject to IM requirements, and therefore already have an IM program and perform annual updates.

*Affected Public:* Hazardous Liquid Pipeline Operators.

*Total Reporting and Recordkeeping Burden:*

*Total Annual Responses:* 10,509.

*Total Annual Burden Hours:* 342,394 hours.

*Frequency of Collection:* Regular.

*2. Title:* Qualification of Pipeline Safety Training.

*OMB Control Number:* 2137–0600.

*Current Expiration Date:* 11/30/2024.

*Abstract:* This information collection covers requirements to make and maintain training and qualification records of pipeline operating personnel. For hazardous liquid pipeline operators, these requirements are described in subpart G of part 195. These records include identification of individuals qualified to perform covered tasks, the covered tasks they are qualified to perform, and the method and date they were qualified. These records must be maintained while the individual is performing qualified tasks, or 5 years after the individual is no longer performing covered tasks. PHMSA estimates that the new USA definitions in the IFR will require operators of rural gathering lines regulated under § 195.11 to keep records of qualification for 30 additional individuals. This results in an average annual burden increase of 5 responses and 1 hour per year over 3 years.

*Affected Public:* Hazardous Liquid Pipeline Operators.

*Total Reporting and Recordkeeping Burden:*

*Total Annual Responses:* 29,172.

*Total Annual Burden Hours:* 2,293 hours.

*Frequency of Collection:* Regular.

*3. Title:* Transportation of Hazardous Liquids by Pipeline: Recordkeeping and Accident Reporting.

*OMB Control Number:* 2137–0047.

*Current Expiration Date:* 3/31/2024.

*Abstract:* This information collection covers hazardous liquid pipeline

accident report requirements in § 195.50 and general recordkeeping burden associated with complying with Federal hazardous liquid pipeline safety regulations in part 195. PHMSA estimates that the new USA definitions in the IFR will require 2 operators of rural gathering pipelines that become regulated under part 195.11 to establish recordkeeping programs to comply with part 195 requirements applicable to regulated rural gathering pipelines. This results in an average annual burden increase of 2 responses and 272 hours per year over 3 years. PHMSA estimates that 4 additional operators of affected rural gathering liens already have part 195 recordkeeping programs associated with regulated assets that they operate. The reporting burden associated with accident reports is unchanged.

*Affected Public:* Hazardous Liquid Pipeline Operators.

*Total Reporting and Recordkeeping Burden:*

*Total Annual Responses:* 743.

*Total Annual Burden Hours:* 45,919 hours.

*Frequency of Collection:* Regular and on occasion.

*4. Title:* Public Awareness Program.

*OMB Control Number:* 2137–0622.

*Current Expiration Date:* 11/30/2024.

*Abstract:* This information collection covers records and reports generated in order to demonstrate compliance with public awareness program requirements. Hazardous liquid pipeline operators must comply with the public awareness program requirements in § 195.440. Program documentation and program evaluation results must be retained and be made available to Federal and State pipeline safety regulatory agencies. PHMSA estimates that the new USA definitions in the IFR will require 2 operators of rural gathering pipelines that become regulated under part 195.11 to establish recordkeeping programs to comply with public awareness program requirements. PHMSA estimates an average annual burden increase of 4 responses and 92 hours per year over 3 years associated with annual program development and program evaluation and update requirements. PHMSA estimates that 4 additional operators of affected rural gathering lines already have public awareness recordkeeping programs associated with regulated assets that they operate.

*Affected Public:* Hazardous Liquid Pipeline Operators.

*Total Reporting and Recordkeeping Burden:*

*Total Annual Responses:* 45,004.

*Total Annual Burden Hours:* 517,592 hours.

*Frequency of Collection:* Regular.

Those desiring to comment on these information collections should send comments directly to the Office of Management and Budget, Office of Information and Regulatory Affairs. Comments should be submitted on or prior to February 25, 2022 via email at the following address: *oira_submissions@omb.eop.gov.*

*Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act (UMRA, 2 U.S.C. 1501 *et seq.*) requires agencies to assess the effects of Federal regulatory actions on State, local, and Tribal governments, and the private sector. For any NPRM or final rule that includes a Federal mandate that may result in the expenditure by State, local, and Tribal governments, in the aggregate of $100 million or more (in 1996 dollars) in any given year, the agency must prepare, amongst other things, a written statement that qualitatively and quantitatively assesses the costs and benefits of the Federal mandate. As explained further in the RIA, PHMSA has determined that the IFR does not impose enforceable duties on State, local, or Tribal governments or on the private sector of $100 million or more (in 1996 dollars) in any one year. A copy of the RIA is available for review in the docket of this rulemaking.

*Privacy Act Statement*

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *www.dot.gov/privacy.*

*National Environmental Policy Act*

The National Environmental Policy Act (NEPA, 42 U.S.C. 4321 *et. seq.*) requires Federal agencies to prepare a detailed statement on major Federal actions significantly affecting the quality of the human environment. The Council on Environmental Quality implementing regulations (40 CFR parts 1500–1508) require Federal agencies to conduct an environmental review considering (1) the need for the action, (2) alternatives to the action, (3) probable environmental impacts of the action and alternatives, and (4) the agencies and persons consulted during the consideration process. DOT Order 5610.1C ("Procedures for Considering Environmental Impacts") establishes departmental procedures for evaluation

of environmental impacts under NEPA and its implementing regulations.

PHMSA analyzed this IFR in accordance with NEPA, NEPA implementing regulations, and DOT Order 5610.1C. PHMSA has prepared an environmental assessment (EA) and determined this action will not significantly affect the quality of the human environment. To the extent that the IFR has impacts on the environment, these are primarily beneficial ecological impacts from reducing the likelihood and consequences of hazardous liquid spills in coastal areas and the Great Lakes. A copy of the EA for this action is available in the docket. PHMSA invites comment on the environmental impacts of this IFR.

*Executive Order 13211*

Executive Order 13211 ("Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use")[53] requires Federal agencies to prepare a Statement of Energy Effects for any "significant energy action." That Executive Order defines a "significant energy action" as any action by an agency (normally published in the **Federal Register**) that promulgates, or is expected to lead to the promulgation of, a final rule or regulation (including a notice of inquiry, ANPRM, and NPRM) that (1)(i) is a significant regulatory action under Executive Order 12866 or any successor order and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) is designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action.

This IFR is a significant action under Executive Order 12866; however, it is expected to have an annual effect on the economy of less than $100 million. Further, this IFR is not likely to have a significant adverse effect on supply, distribution, or energy use, as further discussed in the RIA. Further, OIRA has not designated this IFR as a significant energy action.

*Executive Order 13609 and International Trade Analysis*

Executive Order 13609 ("Promoting International Regulatory Cooperation")[54] requires agencies consider whether the impacts associated with significant variations between domestic and international regulatory approaches are unnecessary or may impair the ability of American business to export and compete internationally. In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

Similarly, the Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. For purposes of these requirements, Federal agencies may participate in the establishment of international standards, so long as the standards have a legitimate domestic objective, such as providing for safety, and do not operate to exclude imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards.

PHMSA participates in the establishment of international standards to protect the safety of the American public. PHMSA has assessed the effects of the IFR and determined that it will not cause unnecessary obstacles to foreign trade.

**List of Subjects in 49 CFR Part 195**

Pipeline safety, Pipelines, Oil pollution.

In consideration of the foregoing, PHMSA is amending 49 CFR part 195 as follows:

## PART 195—TRANSPORTATION OF HAZARDOUS LIQUIDS BY PIPELINE

■ 1. The authority citation for part 195 continues to read as follows:

**Authority:** 30 U.S.C. 185(w)(3), 49 U.S.C. 5121, 60101 *et seq.,* and 49 CFR 1.97.

■ 2. Amend § 195.6 as follows:
■ a. In paragraph (b)(4), remove the word "or" at the end;
■ b. In paragraph (b)(5), remove the period at the end and add in its place "; or";
■ c. Add paragraphs (b)(6) and (7);
■ d. Revise paragraph (c) introductory text; and
■ e. In paragraph (c) add definitions for the terms "certain coastal waters" and "coastal beach" in alphabetical order.

The additions and revision read as follows:

### § 195.6 Unusually Sensitive Areas.

\* \* \* \* \*

(b) \* \* \*

(6) A coastal beach; or

(7) Certain coastal waters.

(c) Definitions used in this part—

\* \* \* \* \*

*Certain coastal waters* means the territorial sea of the United States; the Great Lakes and their connecting waters; and the marine and estuarine waters of the United States up to the head of tidal influence.

\* \* \* \* \*

*Coastal beach* means any land between the high- and low-water marks of certain coastal waters.

\* \* \* \* \*

Issued in Washington, DC, on December 16, 2021, under authority delegated in 49 CFR 1.97.

**Tristan H. Brown,**

*Deputy Administrator.*

[FR Doc. 2021–27751 Filed 12–23–21; 8:45 am]

**BILLING CODE 4910–60–P**

---

[53] 66 FR 28355 (May 22, 2001).

[54] 77 FR 26413 (May 4, 2012).